# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

## STATE OF TENNESSEE, EX REL. ANNE B. POPE v. XANTUS HEALTHPLAN OF TENNESSEE, INC.

**Extraordinary Appeal from the Chancery Court for Davidson County**
**No. 99-917-II     Carol L. McCoy, Chancellor**

---

### No. M2000-00120-COA-R10-CV - Decided May 17, 2000

---

This is an extraordinary appeal pursuant to Rule 10, Tenn. R. App. P.  We are asked to reverse an order of the Chancery Court of Davidson County that would effectively liquidate a managed care organization (MCO) that had been placed in rehabilitation by the Commissioner of Commerce and Insurance.  This review necessarily involves a decision about the extent of the Chancery Court's power in formal delinquency proceedings brought by the Commissioner against troubled insurance companies.  Based on our conclusions that the chancellor's order exceeded her power we reverse the order and remand the cause for further proceedings.

**Tenn. R. App. P. 10 Appeal by Permission; Judgment of the Chancery Court Reversed and Remanded**

CANTRELL, P.J., M.S., delivered the opinion of the court, in which KOCH, J., joined.  CAIN, J. filed a concurring opinion.

Paul G. Summers, Attorney General and Reporter, Michael E. Moore, Solicitor General, Sarah Hiestand, Assistant Attorney General, for the appellant, State of Tennessee, ex rel. Anne B. Pope and Special Deputy Rehabilitators David Manning and Manny Martins.

Jones Wilson Luna, Michael D. Pearigen, Paula A. Flowers, William W. Gibson, Andrew B. Campbell, Nashville, Tennessee, for the appellant, State of Tennessee, ex rel. Anne B. Pope and Special Deputy Rehabilitators David Manning and Manny Martins.

Robert J. Walker, Joseph F. Welborn, III, Nashville, Tennessee, for the appellee, Xantus Corporation.

Paul G. Summers, Attorney General & Reporter, Michael E. Moore, for the Amicus Curiae, The Bureau of TennCare of the Tennessee Department of Finance and Administration.

Charles A. Miller, Washington, D.C., for the Amicus Curiae, The Bureau of TennCare of the Tennessee Department of Finance and Administration.

G. Gordon Bonnyman, Jr., Michele M. Johnson, Christopher Griffin, Nashville, Tennessee, for the Amicus Curiae, Tennessee Health Care Campaign.

James F. Blumstein, Nashville, Tennessee, Amicus Curiae, Vanderbilt University Law School and the Health Policy Center of the Vanderbilt Institute for Public Policy Studies.

Robert C. Goodrich, Jr., Nashville, Tennessee, for the Providers' Committee.

**OPINION**

**I.**

Xantus Healthplan of Tennessee (then known as Phoenix Healthcare) was placed under administrative supervision by the Commissioner of Commerce and Insurance in November of 1998. The Commissioner's action was prompted by the company's failure to maintain the capital required of a managed care organization by Tenn. Code Ann. § 56-32-212. By March of 1999 the Commissioner concluded that Xantus could not remedy its financial ills, and Xantus signed an agreed order of rehabilitation, bringing the problem to the notice of the Chancery Court of Davidson County. The power of the court to oversee the rehabilitation proceeding is at the core of this controversy. First, however, it is necessary to understand the nature of Xantus' business and its role in providing medical care for low-income citizens of this state through a program we know as TennCare.

### a. MEDICAID AND TENNCARE

The federal government established the Medicaid[1] program in 1965 to provide health coverage to low-income Americans, through the use of state and federal funds. Medicaid was designed so that state spending on healthcare for individuals enrolled in the program would be matched by federal funds according to a pre-determined formula. In Tennessee the federal government spent two dollars for each dollar expended by the state. Over the years, the costs of Medicaid rose sharply, consuming an ever-increasing proportion of both federal and state budgets.

There were many reasons for this vast increase in spending, some of which we will briefly touch on here. Because the cost of providing medical services is only partially borne by the states, there is a tremendous incentive for states to expand Medicaid services by leveraging state dollars to increase the federal contribution. See James F. Blumstein & Frank A. Sloan, *Health Care Reform Through Medicaid Managed Care: Tennessee (TennCare) as a Case Study and a Paradigm,* 53 Vanderbilt Law Review 125 (2000). As Professor Blumstein points out, however, when these

---

[1]Medicaid is distinguished from Medicare which was enacted to provide medical care for the elderly.

programs grow to the point where states begin to experience financial distress from funding their shares, it is politically very difficult for them to cut back on that funding, because the resulting loss of federal dollars leads to drastic reductions in medical services.[2]

Another factor contributing to the expansion of Medicaid costs was a set of mandatory program enhancements that Congress enacted in the 1980's to cover several categories of medically-needy people who did not previously qualify for Medicaid under a strict means test. About two-thirds of the costs of these enhancements were still borne by the federal government, but Tennessee was compelled to devote an ever-increasing portion of state revenues to its share of the funding. Though these enhancements have commonly been referred to as "unfunded mandates," they may more accurately be called "incompletely funded mandates"

Another factor was "medical inflation" -- the ever-increasing costs of medical services, which have consistently outstripped the rates of inflation for other types of goods and services. Further, Medicaid was designed to rely on the "fee-for-services" model of paying for healthcare services item by item, one service at a time, which has been called inherently inflationary, because it gives health care providers a powerful incentive to increase their revenues by prescribing more -- and more expensive -- services.

Tennessee's Medicaid costs expanded from less than $1 billion in 1987 to over $2.8 billion in 1993, more than a quarter of the state's budget, with no end in sight. In 1992, Governor McWherter appointed a task force to recommend substantial budget cuts in Tennessee's Medicaid program. The task force faced an unenviable task, because cutting the budget while leaving unchanged the way Medicaid dollars were disbursed would mean depriving many Tennesseans of medical services that they needed and had grown accustomed to.

Some of the members of the task force began to think about ways to get more health services out of the State's Medicaid dollars. They were encouraged in their thinking by the receptivity of the federal government to state-based Medicaid experimentation. Their work resulted in the creation of TennCare. Individuals working on the TennCare concept included Commissioner of Finance David Manning, and State Medicaid Director Manny Martins.

A basic concept behind TennCare was that Medicaid money could be deployed in a more efficient way to deliver medical services at a lower cost. It was even hoped that by replacing "fee for service" with the use of mandatory managed care, the State would be able to extend health coverage to uninsured and uninsurable Tennesseans who had never qualified under Medicaid. The planners had to obtain a waiver from the Healthcare Financing Administration (HCFA) in order to use Medicaid money in this new way, and HCFA approved Tennessee's waiver request to operate

---

[2]The court is indebted to Professor Blumstein for his response to the court's invitation to file an amicus brief. His timely and thorough brief was invaluable in helping the court understand the relationship between TennCare, Medicaid, and the court's role in this proceeding.

the TennCare program for the period January 1, 1994, through December 31, 1998. The waiver was later extended through 2001.

Under TennCare, the State contracts with private companies called managed care organizations (MCOs) to provide medically necessary services to enrollees. The State pays a contractually-determined amount each month ("capitation") for each individual enrolled in that MCO. The federal government's contribution is "capped" at an amount based upon its previous contributions to Medicaid, instead of being open-ended, as it was under the previous matching formula.

Each MCO develops its own network of healthcare providers, with whom it negotiates rates for the services they provide. Thus, the MCOs compete with one another for the enrollees that bring them revenue in the form of capitation fees, and are subject to the risk of loss if they pay more to providers than they receive in capitation fees. At the same time, because the federal contribution was capped, the State would not have a partner to share the extra costs with, if the program itself cost more to operate than was anticipated.

The State initially entered into contracts with twelve MCOs that met its fiscal requirements. These including long-established companies like Blue Cross/Blue Shield, and new startups like Phoenix Healthcare. Over 800,000 prior Medicaid recipients enrolled in TennCare and in one or another of the MCOs. An additional 400,000 Tennesseans who were uninsured or uninsurable, and who would not have met the income requirements for Medicaid, also enrolled.

### b. XANTUS' EXPERIENCE IN TENNCARE

Although TennCare achieved great success in providing access to healthcare to a record number of Tennesseans, while saving money for the state and federal governments, all the MCOs experienced problems of greater or lesser severity. Phoenix (Xantus) had 152,000 enrollees, and was one of only three MCOs that operated on a statewide basis.

Early in 1998, Xantus began having financial difficulties. According to Xantus, these difficulties were a result of problems with the TennCare program. However, reports in the record indicate that the cause of Xantus' financial problems may have been its own ineffective management practices. In any event, Xantus was unable to maintain the capital required of an HMO by Tenn. Code Ann. § 56-32-212. The record indicates that Xantus suffered a net loss of $10 million in April of 1998 causing the company to incur a negative net worth of approximately $8 million. In the same month, the Department of Commerce and Insurance ordered Xantus to develop and submit a plan of action to cure the company's capital deficiency. In May of 1998, Sam Howard, Xantus' CEO, transferred $10 million from an account for Xantus to an account for Xantus Corporation, the parent corporation of Xantus. A plan of action submitted by Xantus in August of 1998 was rejected by the Department of Commerce and Insurance, and in November of 1998 Xantus was placed under administrative supervision. The Department of Commerce and Insurance hired Navigant Consulting, Inc. to evaluate the financial and claims processing operations conducted by Xantus Corporation on

behalf of Xantus. The Department subsequently concluded that Xantus Corporation was unable to remedy Xantus' difficulties and, as we have pointed out, on March 31, 1999, Xantus agreed with the Commissioner to enter into an order of rehabilitation.

## II.

### INSURANCE, THE COMMISSIONER, REHABILITATION AND THE COURT

Title Fifty-Six of the Tennessee Code contains the "Tennessee Insurance Law." Tenn. Code Ann. § 56-1-101. The statutes create a Department of Commerce and Insurance, Tenn. Code Ann. § 56-1-201, and designate a Commissioner as the head of the department. Tenn. Code Ann. § 56-2-202. The Commissioner is appointed by the governor, Tenn. Code Ann. § 4-3-112, and is the chief executive officer of the department, Tenn. Code Ann. § 4-3-111. As often as necessary the Commissioner is required to examine each insurance company licensed in this state to determine whether the company is in an unsound condition. Tenn. Code Ann. § 56-1-408, 409.

In chapter nine of Title Fifty-six, the legislature provided for the rehabilitation and/or liquidation of insurers if necessary to protect "the interests of insureds, claimants, creditors and the public generally." Tenn. Code Ann. § 56-9-101(d). The chapter outlines the procedure for such actions, called "Formal Delinquency Proceedings." Tenn. Code Ann. § 56-9-103(4)(B). The Commissioner is the only person who may institute the proceedings. Tenn. Code Ann. § 56-9-104(a). No court may even entertain an action brought by anyone else. Tenn. Code Ann. § 56-9-104(b).

Tenn. Code Ann. § 56-9-301 allows the Commissioner to petition the Chancery Court of Davidson County for an order authorizing the Commissioner to rehabilitate an insurer. The grounds on which such an order may be sought are set out in subparagraphs 1 through 12 of that section. There is no dispute over the grounds in this case since the insurer agreed to rehabilitation. The following sections contain the specifics of a rehabilitation proceeding, so we reproduce them here at some length.

> **56-9-302. Order to rehabilitate business of insurer -- Effect. --** (a)(1) An order to rehabilitate the business of a domestic insurer, or an alien insurer domiciled in this state, shall appoint the commissioner and the commissioner's successors in office the rehabilitator, and shall direct the rehabilitator forthwith to take possession of the assets of the insurer and to administer them under the general supervision of the court.
>
> (2) The filing or recording of the order with the clerk of the chancery court of Davidson County or recorder of deeds of the county in which the principal business of the company is conducted, or the county in which its principal office or place of business is located, shall impart the same notice as a deed, bill of sale, or

other evidence of title duly filed or recorded with that recorder of deeds would have imparted.

(3) The order to rehabilitate the insurer shall by operation of law vest title to all assets of the insurer in the rehabilitator.

(b) Any order issued under this section shall require accountings to the court by the rehabilitator. Accountings shall be at such intervals as the court specifies in its order, but no less frequently than semi-annually. Each accounting shall include a report concerning the rehabilitator's opinion as to the likelihood that a plan under § 56-9-303(e) shall be prepared by the rehabilitator and the timetable for doing so.

. . .

**56-9-303. Rehabilitator – Duties and authority.** – (a) The commissioner as rehabilitator may appoint one (1) or more special deputies, who shall have all the powers and responsibilities of the rehabilitator granted under this section, and the commissioner may employ such counsel, clerks and assistants as deemed necessary. The compensation of the special deputy, counsel, clerks and assistants, and all expenses of taking possession of the insurer and of conducting the proceedings, shall be fixed by the commissioner, with the approval of the court, and shall be paid out of the funds or assets of the insurer. The persons appointed under this section shall serve at the pleasure of the commissioner. The commissioner, as rehabilitator, may, with the approval of the court, appoint an advisory committee of policyholders, claimants, or other creditors, including guaranty associations, should such a committee be deemed necessary. Such committee shall serve at the pleasure of the commissioner and shall serve without compensation other than reimbursement for reasonable travel and per diem living expenses. No other committee of any nature shall be appointed by the commissioner or the court in rehabilitation proceedings conducted under this chapter.

(b) In the event that the property of the insurer does not contain sufficient cash or liquid assets to defray the costs incurred, the commissioner may advance the costs so incurred out of any appropriation for the maintenance of the department of commerce and insurance. Any amounts so advanced for expenses of administration shall be repaid to the commissioner for the use of the department out of the first available money of the insurer.

(c) The rehabilitator may take such action as the rehabilitator deems necessary or appropriate to reform and revitalize the insurer. The rehabilitator has all the powers of the directors, officers, and managers, whose authority shall be suspended, except as they are redelegated by the rehabilitator. The rehabilitator has full power

to direct and manage, to hire and discharge employees subject to any contract rights they may have, and to deal with the property and business of the insurer.

(d) If it appears to the rehabilitator that there has been criminal or tortious conduct, or breach of any contractual or fiduciary obligation detrimental to the insurer by any officer, manager, agent, broker, employee or other person, the rehabilitator may pursue all appropriate legal remedies on behalf of the insurer.

(e) If the rehabilitator determines that reorganization, consolidation, conversion, reinsurance, merger or other transformation of the insurer is appropriate, the rehabilitator shall prepare a plan to effect such changes. Upon application of the rehabilitator for approval of the plan, and after such notice and hearings as the court may prescribe, the court may either approve or disapprove the plan proposed, or may modify it and approve it as modified. Any plan approved under this section shall be, in the judgment of the court, fair and equitable to all parties concerned. If the plan is approved, the rehabilitator shall carry out the plan. In the case of a life insurer, the plan proposed may include the imposition of liens upon the policies of the company, if all rights of shareholders are first relinquished. A plan for a life insurer may also propose imposition of a moratorium upon loan and cash surrender rights under policies, for such period and to such an extent as may be necessary.

. . .

It is clear from the statutory scheme that the question of whether to rehabilitate or liquidate a troubled insurance company is entirely up to the Commissioner. No court of the state even has the jurisdiction to hear a case seeking to rehabilitate, dissolve, or liquidate an insurance company except upon the petition of the Commissioner. Once the Commissioner has made the decision to seek rehabilitation, if the court approves, the court must appoint the Commissioner the rehabilitator. Tenn. Code Ann. § 56-9-302(a)(1). The rehabilitator's powers are granted by the statute; they include the traditional powers of the insurers' officers, directors, and managers to deal with the property and business of the insurer. Tenn. Code Ann. § 56-9-303(c).

What is the court's role? The court must approve the petition for an order of rehabilitation. Tenn. Code Ann. § 56-9-301. The statutes, however, prescribe what the order of rehabilitation must contain: (1) the appointment of the commissioner as rehabilitator, with directions to take possession of the insurer's assets and administer them under the general supervision of the court, Tenn. Code Ann. § 56-9-303(a); and (2) a requirement that the rehabilitator render an accounting to the court no less frequently than semi-annually, each accounting to include the rehabilitator's opinion as to whether a plan of rehabilitation will be prepared, Tenn. Code Ann. § 56-9-302(b). The court must approve the compensation of special deputies, counsel, clerks, and assistants. But the compensation is fixed by the Commissioner in the first instance, and these administrators serve at the Commissioner's pleasure. Tenn. Code Ann. § 56-9-303(a). The Commissioner as rehabilitator must submit a plan of rehabilitation, which the court may approve, disapprove, or modify and approve as

modified. Tenn. Code Ann. § 56-9-303(e). But the court's approval is guided by a statutory test: what is fair and equitable to all concerned. *Id.*.

We think the statutes make it clear that an insurance rehabilitation proceeding is not the same as an ordinary receivership in which the receiver functions as an officer of the court. See Tenn. Code Ann. § 29-1-103; *KMC, Inc. v. Nabors*, 572 S.W.2d 255 (Tenn. Ct. App. 1977). The rehabilitator derives her powers from the statutes. Although we have not addressed this question before, the courts of other states have taken this view with respect to their rehabilitation statutes. In *Caminetti v. Guaranty Union Life Ins. Co.*, 141 P.2d 423 (Cal. 1943), the Court said:

> . . . the Insurance Commissioner is not an officer appointed by the court to enforce its judgment. He does not derive his power from the court, but from the statute. He has been called a receiver of the assets of the corporation . . ., but he is such not by appointment of the court, but by virtue of legislative enactment. His office is not to perform functions in aid of the court's jurisdiction to decide a controversy between litigants, but he acts as a statutory officer, subject however to judicial supervision to prevent an arbitrary exercise of power or neglect of duty.

141 P.2d at 425.

In the same vein the Washington Supreme Court said:

> [T]he legislature, in its wisdom, in its reliance upon the presumed expertise and experience of a duly elected and functioning state official, and in the public interest, vested the Commissioner with a realistic and effective control over the administration of the affairs and assets of an insurer found to be in need of rehabilitation. The authority so vested necessarily contemplates and embraces a considerable degree of independent administrative judgment and discretion to be exercised by the Commissioner if he is to carry out the responsibility and trust imposed upon him.
>
> . . .
>
> The primary duty impressed by the statute upon the Commissioner in a rehabilitation proceeding is to correct or remove the causes and conditions which have made the rehabilitation proceeding necessary and, if possible, to conserve and restore the company to a viable status for the benefit of the policyholders. Toward this end he must be afforded that freedom of action in the over-all management of the company which will permit him to knowledgeably evaluate, plan, devise, and implement a program which in his best judgment and in keeping with his expertise in the field of insurance will accomplish the objective of the proceeding. And this must be done within and according to the managerial and operational guidelines and requirements set forth in the Insurance Code. As the program of rehabilitation takes form and the steps unfold, the trial court in its supervisory and reviewing role may not substitute

its judgment for that of the Commissioner, but may and should only intervene or restrain when it is made to appear that the Commissioner is manifestly abusing the authority and discretion vested in him and/or is embarking upon a capricious, untenable or unlawful course.

*Kueckelhan v. Federal Old Line Ins. Co.*, 444 P.2d 667, 673-674 (Wash. 1968).

In an earlier decision the Washington Court had said:

The court's sole and proper function in rehabilitation proceedings is to direct – that is, to supervise and review – the actions of the Insurance Commissioner while he is operating the seized insurance company. The courts cannot dictate or outline the general policy or course of conduct of the Insurance Commissioner or his department . . ., because this outline is dependent on the terms of the applicable statutory provisions and not upon judicial discretion. Our statutory provisions, therefore, properly place the responsibility on both the Insurance Commissioner and the courts, the Commissioner being required to follow the statutory mandates and to use reasonable discretion in the rehabilitation of a seized company, with abuses of discretion to be checked by the judiciary.

In this capacity, the court is acting much in the same manner as it acts when overseeing a trust or probate; only in this instance, it is reviewing the Insurance Commissioner who is acting like a receiver or trustee and as an officer of the state. . . . Moreover, the Insurance Commissioner is not acting as an agent of the courts. He holds his position as rehabilitator by force of legislative enactment, confirmed by court appointment. Consequently, the court's power of discretion, vis-a-vis the Insurance Commissioner, is curtailed by the Commissioner's statutory powers and the statutes governing the management of insurance companies and rehabilitation proceedings.

This then is the role carried on by our courts under our laws relating to statutory rehabilitation. The court does not conduct the business of the seized company. This task is assigned by the legislature to the Insurance Commissioner who acts to protect the general public, the policyholders and owners of the company, and the company itself.

*Kueckelhan v. Federal Old Line Ins. Co.*, 418 P.2d 443 at 453 (Wash. 1966).

The chancery court's role is even more limited in a decision to liquidate an insurer. The petition to liquidate must come initially from the Commissioner, whenever she "believes further attempts to rehabilitate an insurer would substantially increase the risk of loss to creditors, policyholders or the public, or would be futile." Tenn. Code Ann. § 56-9-305(a). We repeat our observation that no court may entertain an action to liquidate an insurance company except on the

Commissioner's petition. Tenn. Code Ann. § 56-9-302(a)(1). The chancellor shall allow the directors of the company to defend against the petition. Tenn. Code Ann. § 56-9-305(a). The chancellor may, on her own motion, or on a petition by the Commissioner or the company's directors, decide that rehabilitation has been accomplished and that the grounds for rehabilitation no longer exist. Tenn. Code Ann. § 56-9-305(c). In that case the company shall be restored to the possession of its property and the control of its business. *Id.* As the statutes show, the chancellor's role is limited to deciding that the company should <u>not</u> be liquidated if the Commissioner does not establish the statutory criteria for liquidation.

## III.

### THE CHANCELLOR'S ORDER IN CONTEXT

The initial report of the Special Deputy Rehabilitators filed on May 28, 1999 outlined the steps taken during the rehabilitation to stabilize Xantus' current business operations and assure uninterrupted healthcare services to Xantus' members. These steps included executing an amendment to Xantus' contract with TennCare that guaranteed provider reimbursement for services rendered on or after April 1, 1999; establishing necessary financial controls to assure the protection of Xantus' assets; preparing a proper accounting of pre-rehabilitation and post-rehabilitation assets; instituting a system of cash advances based on the historical claims of Xantus providers; and communicating with Xantus providers and enrollees in an effort to provide uninterrupted healthcare services. At the time of this initial report, Xantus' debt was estimated between $50 million to $60 million. However, it was later determined that the actual amount of pre-rehabilitation debt was closer to $80 million.

After this initial report was filed, Xantus Corporation filed a Proposal for Continued Rehabilitation which challenged the Commissioner's rehabilitation and requested the return of control to Xantus Corporation. On September 2, 1999, the Commissioner filed a Proposed Plan for Operation and Reorganization of Xantus During Rehabilitation. This plan suggested the rehabilitation of Xantus in two phases, a transition phase, during which the administrative infrastructure of Xantus would be restored, and a reorganization phase, during which Xantus would operate under a new management, financial, and operational structure. The proposed plan anticipated a thirty million dollar loan from the State of Tennessee to Xantus. The Commissioner could not guarantee the success of this plan and conceded that under ordinary circumstances a liquidation might be preferable. However, given that no other TennCare plan had the capacity to immediately provide health care services to Xantus' enrollees and the need to pay providers for services rendered, the Commissioner stated that it was imperative that every effort to rehabilitate Xantus be made.

On October 28, 1999, the Commissioner filed a Proposed Plan for Payment of Pre-Rehabilitation Debt. On October 29, 1999, the trial court provided the Special Deputy Rehabilitators with a list of questions to be answered at a hearing on November 12, 1999. At the hearing, after the evidence was presented, the trial court recessed for approximately seven minutes and then returned

to the bench to read a lengthy ruling practically identical to a sixteen page order entered on November 16, 1999.

In this order, the trial court rejected the "piecemeal approach" suggested in the plan submitted by the Commissioner. The order pointed out that the trial court was "shocked" that Xantus "was able to incur $80,000,000 in debt as a highly regulated HMO." The trial court noted that Xantus disregarded statutory requirements, that the parent corporation was fiscally irresponsible when dealing with the assets of Xantus, that inaccurate and contradictory reports were filed with the regulators, that Sam Howard had removed $10 million from a Xantus account after the company had been placed under an order to develop a plan to cure its capital deficiency, and that Sam Howard's salary was not accurately reported. According to the trial court, Xantus "lacked experienced managers, which resulted in significant misfeasance, if not actual malfeasance." The trial court further stated that "[w]hat is most troubling to this Court is the action or lack thereof of the Commissioner during all of this gross mismanagement and the creation of a debt of unbelievable proportions. . . . This Court has little or no confidence in the ability of the Commissioner and his appointees to faithfully fulfill his duties as charged in the statute." The trial court then criticized the State's proposal to loan Xantus $30 million and the alleged inherent conflict of interest the loan would create for the State. The trial court approved the transition phase of the plan, slightly modified by the trial court, but rejected the rest of the plan as submitted by the Commissioner. The trial court ordered that another plan be submitted by January 15, 2000 which addressed the court's concerns outlined in the order.

On December 30, 1999, the Commissioner filed a motion requesting approval of the fees paid to the Special Deputy Rehabilitators and the other third party contractors from April of 1999 to September of 1999. The fees totaled $1,943,040.47. On January 14, 2000, the Commissioner submitted a Supplement to the Proposed Plan of Rehabilitation. In an order dated January 18, 2000, the trial court set a hearing for January 24, 2000 regarding the motion for the approval of fees and a hearing for February 22, 2000 on the supplement to the plan. However, on January 19, 2000, before the date of the scheduled hearing regarding the approval of fees, the trial court issued an order finding:

(1) that the Commissioner had failed to timely seek the trial court's approval for decisions regarding rehabilitation evidencing the "cavalier attitude of the State and the Special Deputies towards the judiciary," "arrogance," and a "lack of consideration for the role the Court plays in receivership;"

(2) that the Commissioner had an inherent conflict of interest resulting from the State's loan of $30,000,000 interest-free to Xantus;

(3) that the fees requested by the Commissioner for services of the Special Deputy Rehabilitators and other third party contractors embodied a "spirit of exorbitance," that some of the fees were "duplicative or unnecessary," "outrageous," "shocking,"

"disturbing," and "suspect," and that the fees paid reflect a "disturbing lack of concern for the purpose of the rehabilitation statute;"

(4) that administrative expenses were "incurred without regard for the significant duty that a fiscally prudent steward of public funds owes to the general public" and that the Commissioner and the Special Deputies had been "derelict in their duty to the general public;"

(5) that the "precarious financial condition of Xantus and its extremely poor prior management did not warrant plundering the public funds;"

(6) that the State's interest in Xantus as it affects TennCare had "impaired the Commissioner's objectivity" and was "fraught with political objectives which exceed the scope of a statutory rehabilitation;"

(7) that "[i]f the noble experiment known as TennCare fails because Xantus fails, it will be because Xantus was not properly supervised and managed at the time of its conception, during its private operation and during this rehabilitation;"

(8) that there had been "misrepresentations made by the Rehabilitator's agents" about the trial court demonstrating a "nonchalant, if not disrespectful, attitude" toward the trial court; and

(9)  that it "may be time to pull the plug" on Xantus.

The order went on to direct the Commissioner to recover all fees and expenses paid during the rehabilitation, to incur no further administrative or consultant expenses in furtherance of the rehabilitation without prior explicit court approval, and to send a copy of the order to the 7,200 healthcare providers who had claims pending with Xantus on April 1, 1999.  We granted an extraordinary appeal under Rule 10, Tenn. R. App. P.

**IV.**

At the outset, it is important to note what this case is not about.  It is not about Sam Howard; it is not about Xantus' pre-rehabilitation management, nor the Commissioner's alleged failure to detect and prevent Xantus' financial collapse.  All of us may have opinions about these questions, but they are not issues in the pleadings before us.  The court is not an avenger at large; even the historic powers of chancery as a reforming agent are circumscribed by the constitutional principles of due process and separation of powers. *Lynn v. Polk*, 76 Tenn. 121 (1881). "[I]t cannot interpose in any case against the express letter and intention of the legislature.  If the legislature means to enact an injustice, however palpable, the court of chancery is not the body with whom a correcting power

-12-

is lodged."[3] The regulation of insurance companies has been assigned to the Commissioner by the legislature and the court does not oversee that process.

This case <u>is</u> about the Xantus rehabilitation and the court's January 19 order. We will address the specific problems the order presents.

### a. DE FACTO LIQUIDATION

The Commissioner asserts that the chancellor's order prohibiting the Commissioner from incurring any further administrative or consultant expenses without prior court approval amounts to an order to liquidate the company. We agree. As we have noted, the Commissioner has the sole authority to determine when to petition the court for an order of liquidation. The court's role is limited to approving the petition, after giving the company an opportunity to be heard, or to disapproving the petition if the statutory requirements for liquidation have not been met. The court does not decide when to "pull the plug" on a company in rehabilitation.

Rehabilitation is preferred over liquidation because of the public interest in insurance. *Minor v. Stephens*, 898 S.W.2d 71 (Ky. 1995). Although the Commissioner may directly petition for liquidation without going through rehabilitation, *United Physicians Ins. v. United American Bank of Memphis*, No. 01-A-01-9503-CH-00096 (Tenn. Ct. App. filed Feb. 7, 1996, at Nashville), the public interest generally favors rehabilitation. The Supreme Court of California noted this preference by holding:

> <u>There appears from the pattern of the statutes dealing with insurer insolvencies an underlying theme of resolution of questions for the benefit of policyholders by rehabilitation if possible. This is not merely a resolution of private rights, but also a matter of the public interest because of the character of insurance.</u> In carrying out his or her responsibility, the Commissioner acts not only as a trustee but also as a servant of the state in the exercise of its police power. In some instances, individual policyholders must suffer some detriment if this is necessary to carry out the purpose of the statutory scheme. The limitation upon the Commissioner's authority is that its exercise be reasonably related to the public interest in rehabilitating the insurer, and not be arbitrary or improperly discriminatory.

*In re Executive Life Ins. Co.*, 38 Cal. Rptr. 2d 453 at 471-472 (Cal. App. 1995)(emphasis added.)

Other states have recognized that the decision to attempt rehabilitation is within the sound discretion of the Commissioner and should not be rejected by the courts unless the Commissioner has abused that discretion. *Foster v. Mutual Fire, Marine and Inland Ins. Co.*, 614 A.2d 1086 (Pa.

---

[3]*Thomas Jefferson to Philip Mazzei*, November 1785, explaining the origin and object of the court of chancery.

1992); *Kueckelhan v. Federal Old Line Insurance Company*, 444 P.2d 667 (Wash. 1968)(only if the Commissioner is manifestly abusing the authority and discretion vested in her or is embarking upon a capricious, untenable or unlawful course.)

The state's interest in providing medical care for poor persons seems too obvious for elaboration. If we, as a state, were not ourselves interested, the federal government has thrust that interest upon us. How to accomplish that goal at the least cost to the state is a decision that has to be made by the other branches of the government. Xantus and its 153,000 enrollees form a significant part of the TennCare system. The record does not provide any answers to our concerns about what would happen to them if Xantus were liquidated. However, virtually all the parties appearing before us stated that the forced liquidation of Xantus at this time would have profound consequences. First, the 153,000 Xantus enrollees would be forced back into the market to try to find replacement insurance. Many of them are uninsurable, and other MCOs, already struggling with their own TennCare problems, would not likely take them on. Second, the failure of the second largest TennCare MCO could destabilize the whole TennCare program at a time when the program's future is clouded. Third, the forced liquidation of Xantus would eliminate any real possibility that the currently unpaid service providers would recover any portion of the amounts due for services already performed. If the state were required to reassemble the state Medicaid bureaucracy that was disassembled in 1993 and pay a "fee for service" for the Xantus enrollees, the increased costs make keeping Xantus afloat an attractive option.

It does not appear to us that the Commissioner has acted arbitrarily or has embarked upon a capricious, untenable, or unlawful course in deciding to keep Xantus in rehabilitation.

### b. THE $30 MILLION LOAN

The trial court specifically disapproved of the $30 million loan to the rehabilitation from state funds. We note, however, that the statutes provide that the Commissioner may advance funds to the rehabilitation when the insurer's cash and liquid assets are not sufficient to defray the costs incurred. Tenn. Code Ann. § 56-9-303(b). In addition, as we pointed out above, the decision as to how to fulfill the state's role in providing medical care to poor persons at the least cost to the state is a decision that addresses itself to the other branches of government. The point that should not get lost is that the state government would be funding and operating the TennCare program directly if the MCOs were out of the picture. The courts did not review the state's decision to set up TennCare in the first place or to appropriate the $30 million to keep it afloat.

### c. FEE APPROVAL

The Commissioner concedes that in an ordinary rehabilitation proceeding, the court must approve the compensation paid to the special deputies, counsel, clerks, and assistants. She argues, however, that in this rehabilitation, because none of the funds used to pay such expenses come from the assets of the insurer, the court has no statutory authority to deny the reasonableness of the fees and expenses paid. We are not convinced, however, that the source of the funds used in the

-14-

rehabilitation has any bearing on the extent of the court's oversight. It is true that in an ordinary rehabilitation the costs are paid out of the company's assets; while in this case the administrative expenses are paid out of funds from a TennCare and HCFA reimbursement guarantee.[4] Yet, the statutes do not make any distinctions about where the money comes from, and the court has the statutory power to "protect the public generally." Tenn. Code Ann. § 56-9-101(d). Therefore, we think the chancellor has the power to review the fees and expenses paid by the rehabilitator in this case.

The Commissioner also questions the power of the court to raise the fee issue on its own motion. Under Local Rule § 26.04 of the Davidson County Courts of Record, motions (with an exception not applicable here) are routinely granted if unopposed. Since the motion to approve the fees and expenses was unopposed, the Commissioner argues that the chancellor should have granted it.

We think the Commissioner's argument puts form over substance. The local rules themselves allow for deviations in "exceptional cases where justice so requires." Local Rule § 1.03, Davidson County Courts of Record. We think this is the exceptional case, where it is almost certain that no one would appear to oppose the payment. As the Commissioner points out, the money does not come from the Xantus assets; it is all public money, and once out of the hands of the taxpayers, who is to quarrel with how it is spent? Therefore, under its statutory power to "protect the public generally," Tenn. Code Ann. § 56-9-101(d), the court may, on its own motion, review the Commissioner's request for the payment of fees and other extraordinary expenses.

### 1. BEFORE OR AFTER THE FACT?

The chancellor's order directed the Commissioner to get court approval before incurring any further administrative or consultant expenses. We are of the opinion that the Commissioner does not have to get prior approval from the court before contracting for the services needed to carry on the rehabilitation. Tenn. Code Ann. § 56-9-303(a) provides:

> The compensation of the special deputy, counsel, clerks, and assistants, and all expenses of taking possession of the insurer and of conducting the proceedings, shall be fixed by the commissioner, with the approval of the court . . . .

Reading this provision in the context of other statutory provisions requiring the Commissioner to "forthwith ... take possession of the assets of the insurer and to administer them under the general supervision of the court," Tenn. Code Ann. § 56-9-302(a)(1), and giving the

---

[4]According to the State's brief, the Special Deputy Rehabilitators obtained an amendment to Xantus' contract with the TennCare program which guaranteed reimbursement for all reasonable, actual administrative expenses of the rehabilitation. However, payment of such costs remains in effect only for such period of time that Xantus remains in rehabilitation. This amendment was subsequently approved by the federal Health Care Financing Administration (or HCFA).

Commissioner the power of "directors, officers, managers ... to hire and discharge employees subject to any contract rights they may have," Tenn. Code Ann. 56-9-303(c), it is clear that the Commissioner does not have to get prior approval from the court to incur expenses associated with the rehabilitation. The only practical way the Commissioner can carry out the duties imposed on her by the statutes is to have the freedom to contract with the specialists needed to carry on the business. The court must ultimately approve the fees paid to the "special deputy, counsel, clerks and assistants," but the fees are set in the first instance by the Commissioner.

## 2. THE SCOPE OF THE COURT'S REVIEW POWERS

The chancellor set out a seven-part test for determining the reasonableness of the fees paid to the Special Deputy Rehabilitators and third-party contractors.[5] We cannot quibble with the factors as a general proposition. They contain many of the same considerations that go into setting a reasonable legal fee contained in DR 2-106 of the Code of Professional Responsibility. See Rule 8, Rules of the Supreme Court.

A reasonable fee for services should be governed by market principles; that is, what the services would bring in an arms length freely-bargained transaction. The best evidence of a reasonable fee is what the provider has billed and been paid in furnishing comparable services to other clients. If no direct market experience for the individual provider is available, the fees can be compared to the usual and customary fees charged by persons of similar expertise and experience. *See Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253 (3rd Cir. 1995) for an application of these principles in a bankruptcy proceeding.

The Commissioner asserts, however, that she is the one who must apply the criteria in the first instance and the court's role is to satisfy itself that she has properly done so. This assertion is based on another court's interpretation of the California Insurance Code, which contains language similar to Tenn. Code Ann. § 56-9-303(a). The California court said:

> "Approval," as opposed to the "award" language more common in fee-shifting statutes, connotes an initial discretion in the Commissioner to determine whether fees billed are proper. The Commissioner is the public officer designated as the steward for the funds of the insolvent insurer whose estate he or she administers. The Commissioner's initial determination necessarily requires

---

[5]The factors are (1) the results achieved by the Special Deputies and the third party contractors, (2) the fair value of the time and labor required in the performance of their respective duties, as measured by ordinary business standards, (3) the degree of activity, integrity and dispatch with which the work was performed, (4) the difficulty of the problems involved, (5) the size of the company, (6) the qualifications of the individuals involved, and (7) the duties actually performed.

adequately detailed information describing the work performed, by whom it was performed, the time spent and when it was spent, and the rate and amount billed, unless an approved contract of employment specifies a different basis of compensation. . . .The Commissioner should possess sufficient information to be able to determine from the billings any excessive or duplicative charges, and seek clarification and correction where appropriate. Where compensation is on other than an hourly basis, the Commissioner must possess adequate information to determine that the terms of the engagement were satisfied.

To obtain court approval for payment of the fees deemed appropriate, the Commissioner must supply the court with adequate information to permit intelligent evaluation of the basis for the Commissioner's determination. The court must be satisfied that the Commissioner has performed his duty to protect the interests of the estate. It is not required by statute, nor is it practical, for the court to undertake a detailed review of the invoices before approving payment. The Commissioner must, however, be ready to provide whatever documentation the court may find necessary in determining the propriety of the Commissioner's request that payment be approved.

*In Re Executive Life Ins. Co.*, 38 Cal. Rptr. 2d 453 at 487 (Cal. App. 1995).

We think the California court was correct, and we adopt this so-called "California test" to apply in rehabilitation or liquidation proceedings under Title 56 of the Tennessee Code. Just as the court is required to defer to the Commissioner's discretion in conducting rehabilitation or liquidation proceedings, the court should be able to rely on the Commissioner's discretion in approving the fee requests. The court is not required to undertake a "detailed review of the invoices" before approving the payment. "The Commissioner must, however, be ready to provide whatever documentation the court may find necessary in determining the propriety of the Commissioner's request that payment be paid." 38 Cal. Rptr. at 487.

Having come to that conclusion, we are asked to go ahead and approve the fee requests. We decline to do so because we think that function should be performed first by the chancellor in light of the principles we adopt in this opinion. Also, we are not certain that the information furnished to the court satisfies the principles we adopt or that the record shows the required evaluation of the fees by the Commissioner.

### 3. DISGORGEMENT

When the court found that the fees already paid embodied a spirit of exorbitance and were outrageous and shocking, the court required the Commissioner to recover all fees and expenses paid during the rehabilitation. As we have pointed out, the court made its findings without the benefit of a hearing on the reasonableness issue, and the only evidence in the record indicates that the fees

were reasonable. On remand this issue should be addressed under the principles we adopt in this opinion.

## V.

### THE PLAN OF REHABILITATION

The rehabilitation statutes require the Commissioner to account to the court at least twice a year and to include an opinion as to whether a plan of rehabilitation will be prepared. Tenn. Code Ann. § 56-9-302(b). If the Commissioner decides to rehabilitate, she must submit a plan, which the court may approve, reject, or modify and approve as modified. Tenn. Code Ann. § 56-9-303(e). In any event the court is to be guided by what is fair and equitable to all concerned. *Id.* We think the state's interest in providing health care for its low-income citizens at the lowest cost to the state is an interest that deserves consideration.

The chancellor has before her a proposed plan filed on September 2, 1999, and an amendment to that plan filed January 14, 2000. The court's order of January 19, 2000 did not specifically reject the plan, although the effect of the order is unmistakable. We think the Commissioner is entitled to be heard on the proposed plans, and we remand this cause for further proceedings in accordance with this opinion.

Considering the trial court's sweeping criticism of the Commissioner's rehabilitation strategy, the performance of the special deputy rehabilitators, the findings of conflicts of interest, and the repeated references to the Commissioner's pre-rehabilitation failure to detect and prevent the Xantus debacle – all prior to a hearing set for the purpose of reviewing the plan – we have some concern about the court's objectivity in reviewing the plan and the Commissioner's application for fee approval. The Commissioner, like all other litigants, is entitled to the "cold neutrality of an impartial court." *Leighton v. Henderson*, 414 S.W.2d 419, 421 (Tenn. 1967); Tenn. S. Ct. Rule 10, Canon 2(A). Neutrality requires not only that a judge be neutral in fact but also that the judge be perceived to be neutral. *See Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. App. 1998).

Our concern is somewhat alleviated, however, by the recognition that the chancellor's findings were made at a time when the exact role of the court in rehabilitation proceedings had not been decided by the courts of this state. Accordingly, we indulge the presumption that public officials will discharge their duties in good faith and in accordance with the law, *Williams v. American Plan Corp.*, 392 S.W.2d 920 (Tenn. 1965), and assume that on remand the proceedings will be conducted in a fair and impartial manner and in accordance with the applicable legal principles set out in this opinion.

The chancellor's January 19, 2000 is reversed and the cause is remanded. Tax the costs on appeal to the Commissioner as rehabilitator.

-18-