[Nos. 40238, 39754.   En Banc.   August 15, 1968.]

LEE I. KUECKELHAN, *Petitioner,* v. FEDERAL OLD LINE
INSURANCE COMPANY (MUTUAL), *Respondent.**

*Trethewey, Brink & Wilson,* by *Daniel Brink,* for peti-
tioner.

*Malcolm L. Edwards,* for respondent.

HAMILTON, J.—In 1963, the petitioner, hereafter referred
to as the Commissioner, instituted this action against Fed-
eral Old Line Insurance Company (a domestic mutual),
hereafter referred to as the company, under the provisions
of RCW 48.31.030, praying for an order to rehabilitate the
company. Following an extensive hearing, such an order

*Reported in 444 P.2d 667.

was entered on November 10, 1964. On appeal the order was affirmed. *Kueckelhan v. Federal Old Line Ins. Co. (Mutual)*, 69 Wn.2d 392, 418 P.2d 443 (1966).

The causes for the order of rehabilitation are stated fully in the trial court's initial findings of fact and in some detail in our prior opinion. Briefly, however, they consisted of the company's failure to adhere to the requirements of the insurance code in that the company (a) invested more than 4 per cent of its assets with a single entity, contrary to RCW 48.13.030; (b) invested in mortgage loans which exceeded 66 2/3 per cent of the fair value of the mortgaged property, contrary to RCW 48.13.120; (c) invested more than 65 per cent of its assets in real-estate loans, contrary to RCW 48.13.265; (d) permitted or acquiesced in the continued existence of prior encumbrances or clouds upon the title of mortgaged property, which rendered the mortgages inadmissible as assets under RCW 48.13.110 and 48.13.130; (e) engaged in such practices as crediting delinquent interest due on the mortgages by increasing the face amounts of the mortgages thus reflecting an incorrect picture of company income and the delinquent status of the mortgages; and (f) failing to comply with the Commissioner's order of May 28, 1963, directing correction of the deficiencies.

Based upon the foregoing grounds the trial court's order of November 10, 1964, provided in pertinent part:

1. It Is HEREBY ORDERED that the plaintiff, LEE I. KUECKELHAN, Washington State Insurance Commissioner, be, and he is hereby directed on November 16, 1964, to take possession of all of the assets, books, records and files and all other property, real and personal, whether in the State of Washington or elsewhere, of the defendant, FEDERAL OLD LINE INSURANCE COMPANY (MUTUAL), and that said plaintiff shall conduct the business of the defendant, to rehabilitate the same, and to take such steps toward removal of the causes and conditions as set forth in the Findings of Fact herein which have made rehabilitation necessary, under the direction and supervision of the court.

2. It Is FURTHER ORDERED that the defendant, . . . its officers, employees, agents and attorneys, be,

and they are hereby enjoined from interfering with the possession of the defendant company by said plaintiff,
. . . .

. . . .

6. IT IS FURTHER ORDERED that said defendant, its officers, employees, agents and attorneys be, and they are hereby commanded and enjoined peacefully to deliver up and surrender to the plaintiff and his agent and attorneys . . . the premises whereof plaintiff is appointed rehabilitator, and to deliver to him all keys thereto,
. . . .

This order was entered pursuant to and in conformity with RCW 48.31.040, which provides:

(1) An order to rehabilitate a domestic insurer shall direct the commissioner forthwith to take possession of the property of the insurer and to conduct the business thereof, and to take such steps toward removal of the causes and conditions which have made rehabilitation necessary as the court may direct.

In affirming the order, we stated in our former opinion, at 421:

The order of the trial court is affirmed, and the cause is remanded to the trial court for further proceedings consistent with the provisions of the insurance code and with any intervening changes in appellant's financial affairs.

The remittitur from the former appeal was returned to the King County Superior Court on December 5, 1966. On December 9, 1966, the trial court decreed that the order of November 10, 1964, was in full force and effect. The order, however, was never fully implemented by the company, the Commissioner, or the trial court. Instead, there followed a series of motions and hearings which, in the early part of 1967, gave rise to four interlocutory orders, none of which permitted the Commissioner, acting through a special deputy commissioner, to assume full control of the company as rehabilitator in order to rehabilitate it or to remove any of the causes and conditions requiring rehabilitation.

The fourth interlocutory order of June 16, 1967, reaffirmed again the order of November 10, 1964, as being in

full force and effect and then proceeded to adopt and impress upon the proceedings a set of rules designated as an Administrative Operations Manual. This manual is elaborate and detailed. In essence, it divided the operations of the company into six separate divisions, each placed under the administrative direction of one of the company's officers, with the exception of the division of investments which it placed under the supervision of the Commissioner. It required that any significant action by the Commissioner could only be taken after notification to and consultation with the company officers, commencing with the lowest management level and, absent agreement, proceeding through the top level management, the parties' attorneys and finally into court. Likewise, while affording the Commissioner a degree of control over company expenditures, it left in the hands of certain company officers the authority to incur indebtedness and to issue checks to a specified extent. The Commissioner sought appellate review of this fourth interlocutory order and the adoption of the Administrative Operations Manual. Pending review, the manual remained in effect and culminated in the entry of the ninth interlocutory order which is before us at the present time and brings with it the full record of the proceedings to date of its entry.

From the inception of the proceedings with the return of the remittitur, and during the period following entry of the fourth interlocutory order, the Commissioner has sought to effect economies in the company operation, procure a current accounting of the financial affairs of the company, obtain appraisals of the properties securing the outstanding and delinquent mortgages, secure title reports on the properties, quiet titles where necessary, forestall delinquent tax foreclosures, and to market, foreclose or otherwise realize some income from the delinquent mortgages, to the end that the investment practices and portfolio of the company may be brought into line with the requirements of the Insurance Code. At every stage of the proceeding the company has resisted and opposed any significant effort on the

part of the Commissioner, and in the main the company's objections have been permitted and sustained by the trial court.

We cite the following by way of example of some of the conflicts emanating from the dual and divided administration of the company.

The company has not, with but minor exception, marketed life insurance since 1957. It has, however, maintained a sales training school, salesmen, and branch offices throughout the state which have been utilized to a great extent in real-estate promotional activities, much of which concerned the Federal Shopping Way complex. In various ways much of the expense of these promotional activities was charged to the company. (Parenthetically it can be noted that with the assistance of company personnel there has been sold some $2,700,000 in undivided property interests belonging to Federal Shopping Way, Inc., the guarantor of the mortgages held by the company in the shopping way area, none of which money has been sought by the company or utilized to pay any accrued and delinquent interest or principal on the outstanding mortgages, or to pay any of the delinquent taxes encumbering the property securing the mortgages.) The Commissioner has, in the interest of economy and in an effort to channel the company's activities away from real-estate promotion, advocated the closure, temporarily at least, of the training school and branch offices, a course which has been strenuously opposed by the company. Despite the Commissioner's efforts the company's activities continued, until the economics of the situation forced some closures.

Likewise, the Commissioner sought to control and limit the advertising, travel, and miscellaneous expense being incurred by company officials on the grounds that much of these were presently unnecessary in servicing a virtually closed block of insurance policies. Again, the Commissioner's efforts were thwarted, e.g., a company sponsored softball team was retained and sent to Hawaii, the president of the company made a trip to London, radio programs

continued, song books were distributed,[1] monthly staff breakfasts and meetings conducted, and credit cards in the hands of company and unrelated personnel performing duties for Federal Shopping Way, Inc., were utilized, all at considerable expense and with the bills being submitted for the consideration of the Commissioner and the trial court on an after-the-fact basis.

The Commissioner sought approval and authority to engage the services of an appraisal firm to update the initial appraisals on the properties securing the mortgages and to assist him in evaluating the various securities. This was resisted and at best only partially permitted.

The Commissioner requested authority to foreclose or at least be authorized to threaten foreclosure of delinquent mortgages. This was opposed and the authority was denied.

Conflict of interest statements from the various officers and directors of the company were requested by the Commissioner. This was asked on the basis that some of the mortgages indicated some of them were or had been signators on behalf of the mortgagors, and it was acknowledged that the president of the company was also the president of Federal Shopping Way, Inc., the guarantor of the mortgages. All but the president of the company submitted abbreviated statements. The president submitted none. The trial court refused to terminate or diminish the authority of any of the officers or directors indicating a possible conflict of interest, despite the patent and persistent efforts of the company through its officers to avert any action by the Commissioner which would upset the status quo or otherwise lead to the collection of delinquent interest or the possible foreclosure of any of the delinquent mortgages.

Early in 1967 it was agreed by all parties that the policyholders be informed by a letter as to the status and progress of the rehabilitation proceeding. The Commissioner submitted a proposed letter to the company. Delay ensued and a dispute developed as to the terminology of the letter.

---

[1] The songbook advertising approach is outlined and referred to at some length in *Federal Old Line Life Ins. Co. (Mutual) v. Sullivan,* 33 Wn.2d 358, 206 P.2d 311 (1949).

The dispute was presented to the trial court and the matter was referred for further deliberation between counsel for the parties. A letter was finally sent out late in the year, but then only to the policyholders with claims pending.

A further recitation of the conflicts arising between the parties during the course of their dual administration would unnecessarily extend this opinion. Suffice it to say that their partnership has been an unhappy one.

The company throughout has sought to sustain its position and its actions upon the grounds that the difficulty the company finds itself in was and is attributable to fault on the part of the Commissioner, *e.g.,* one officer testified that the Commissioner was at fault in not notifying the company of the accruing delinquencies in real-estate taxes upon the properties securing the mortgages in question, and this despite the fact that the company president was at all times the president of Federal Shopping Way, Inc., and deeply involved in promoting tenants, developers, and/or purchasers for the tracts of property involved. Furthermore, the company asserts that, although no interest or principal has been forthcoming upon any of the mortgages in question since their inception, the market value of the property securing the mortgages has increased in value, thus justifying treatment of the delinquent interest and principal on a long time accrual basis, until such time as company's efforts in packaging and selling or otherwise promoting the tracts involved will permit payment by the mortgagors. In this vein the company points to a fairly recent disposition of properties under mortgage to it which brought into the proceedings some $400,000 in cash. The company, therefore, asserts that the Commissioner's proposals and efforts are tantamount to liquidation rather than rehabilitation.

On the other hand, the Commissioner avers that the officers of the company and the company's administrative and investment policies must bear the major responsibility for the plight now facing it. He contends that the past and present practices of the company have led, not only to the

breaches of the Insurance Code occasioning the necessity for rehabilitation, but have given rise to a crucial and urgent cash flow problem of such dimensions as to preclude any further indulgence of the mortgagors' delinquencies or Insurance Code violations. The Commissioner also points to the fact that the past manipulations of the mortgages and the titles of the property securing the mortgages are such as to cast a cloud upon the viability or priority of the mortgages and that a thorough title examination must be had and possibly quiet title actions instituted to render either the mortgages or the titles marketable and merchantable. Furthermore, the Commissioner emphasizes that although the property involved may be increasing in value, the only benefit to the company is the enhancement of its security since the most it could expect to receive, in the absence of foreclosure, is the interest and principal on its mortgages, which it presently needs in substantial part if it is to bring itself into compliance with the Insurance Code and become rehabilitated.

We do not undertake in this proceeding to parcel out blame between the parties. Unfortunately, however, the present facts and circumstances lead to the conclusion that the company's administrative and investment practices, together with its persistent preoccupation with real-estate promotion in the Federal Way area, have brought the company to the brink of disaster in its insurance operations. Its major source of current income is limited to premiums being paid upon a relatively small, closed and maturing block of insurance policies. Its administrative costs as presently operated and as have been advocated by the company officers nearly equal if they do not exceed its income. It is unable to meet the outstanding claims of its policyholders, which amount to more than $900,000. Further claims will necessarily accrue. King County has initiated a suit against the company seeking to recover unpaid real-estate excise taxes in connection with the company's financial and real-estate activities in the Federal Way area. The county has also commenced a tax foreclosure suit on properties mortgaged to the company. A mortgage foreclosure suit is pend-

ing against the company's home office property. The company has been joined as a party defendant in an action alleging fraud in the sale of undivided property interests in a portion of the Federal Way complex owned by Federal Shopping Way, Inc., and seeking recovery of the consideration paid ($2,700,000). A lessor of business machines is pursuing recovery of delinquent rentals from the company. A former employee of the company and the attorney who represented the company on the previous appeal are claiming allegedly unpaid wages and fees. The Securities and Exchange Commission has instituted proceedings in federal court against Federal Shopping Way, Inc., the guarantor of the company's mortgages, arising out of the aforementioned sale of property interests and a receiver pendente lite has been appointed. And, a Chapter X bankruptcy proceeding was pending against Federal Shopping Way, Inc., at the time of the last hearing in the trial court.

In the course of the evolvement of the foregoing circumstances and against the backdrop created thereby, the trial court directed that the respective parties prepare and present for consideration comprehensive plans for rehabilitating the company. This the parties did, and, after appropriate notice, the plans as prepared came on for hearing before the trial court on February 23, 1968. An 8-day hearing followed.

In essence, the Commissioner submitted a plan which contemplated authorization for (a) discretionary removal of the officers and directors from positions of authority pending rehabilitation; (b) administration of the company in a way designed to conserve the assets pending solution of the various problems; (c) evaluation and clarification of the assets of the company to make them more manageable, productive and/or marketable; (d) quiet title and foreclosure actions as necessary to convert and liquify assets in sufficient amounts to meet policy claims and remove the causes for rehabilitation; (e) defense of pending lawsuits; and (f) obtaining, subject to court approval, reinsurance of policies where necessary and presenting a claim payment

program as progress of the proceedings permitted. Expert testimony in support of the plan was presented.

The company, on the other hand, with the aid of expert testimony, proposed a plan whereby (1) the company would be internally divided into two divisions, an "operating division" and a "prior division"; (2) the operating division would be composed of policyholders who acquired their policies since January 1, 1957, and the prior division of those who acquired their policies before 1957; (3) the operating division would be assigned sufficient admissible assets, specified liabilities and sufficient present and future premium income to render it qualified to sell life insurance policies without contingent liability and to pay the claims of its policyholders immediately; (4) the prior division would be assigned the remaining admissible and nonadmissible assets, reserves, and liabilities and would undertake to pay its policyholder claims at the rate of 2 per cent per month; (5) an effort would be made to borrow sufficient funds to permit the re-establishment of the company's insurance sales force, initiate a sales program and tide the company over until such time as the premium income and other sources of developed income would carry the operation and the two divisions could be reunited.

The trial court rejected the Commissioner's plan "out of hand" and adopted the company's plan in substance. The trial court then asked the Commissioner to advise the court whether he would "follow the court's direction in letter and in spirit to cooperatively accomplish this plan, or stand removed." The Commissioner replied that he could not in good conscience or under the Insurance Code acquiesce in authorizing the insurance sales program proffered by the company until such time as the total financial picture of the company met the statutory requirements. The trial court thereupon, by its ninth interlocutory order, removed the Commissioner as rehabilitator, appointed an equitable receiver, directed the appointee to prepare and implement a plan of rehabilitation in keeping with the company's plan, and preserved in force the Administrative Manual adopted

by the fourth interlocutory order. The Commissioner made prompt application for a writ of prohibition in this court. This court decided to treat the application as one for writ of certiorari to the end that a complete review could be had. A complete statement of facts and transcript of all proceedings, including the proceedings leading up to the entry of the fourth interlocutory order, are, accordingly, now before this court.

Our review of the proceedings convinces us that the trial court erred in (a) adopting and enforcing the Administrative Operations Manual; (b) peremptorily discarding the Commissioner's plan and adopting the plan of rehabilitation proposed by the company; and (c) removing the Commissioner as rehabilitator.

As we earlier pointed out herein, the pertinent and applicable statute, RCW 48.31.040, provides:

> (1) An order to rehabilitate a domestic insurer shall direct the commissioner forthwith to take possession of the property of the insurer and to conduct the business thereof, and to take such steps toward removal of the causes and conditions which have made rehabilitation necessary as the court may direct.

Thus, the legislature, in its wisdom, in its reliance upon the presumed expertise and experience of a duly elected and functioning state official, and in the public interest, vested the Commissioner with a realistic and effective control over the administration of the affairs and assets of an insurer found to be in need of rehabilitation. The authority so vested necessarily contemplates and embraces a considerable degree of independent administrative judgment and discretion to be exercised by the Commissioner if he is to carry out the responsibility and trust imposed upon him. In this vein, and speaking of the part played by the court in a rehabilitation proceeding, we said in *Kueckelhan v. Federal Old Line Ins. Co. (Mutual)*, 69 Wn.2d 392, 418 P.2d 443 (1966), at 406:

> The court's sole and proper function in rehabilitation proceedings is to direct—that is, to supervise and review —the actions of the Insurance Commissioner while he is

operating the seized insurance company. The courts cannot dictate or outline the general policy or course of conduct of the Insurance Commissioner or his department [Citing case.], because this outline is dependent on the terms of the applicable statutory provisions and not upon judicial discretion. Our statutory provisions, therefore, properly place the responsibility on both the Insurance Commissioner and the courts, the Commissioner being required to follow the statutory mandates and to use reasonable discretion in the rehabilitation of a seized company, with abuses of discretion to be checked by the judiciary. [Citing authority.]

In this capacity, the court is acting much in the same manner as it acts when overseeing a trust or probate; only in this instance, it is reviewing the Insurance Commissioner who is acting like a receiver or trustee and as an officer of the state. (Citing authority and case.) Moreover, the Insurance Commissioner is not acting as an agent of the courts. He holds his position as rehabilitator by force of legislative enactment, confirmed by court appointment. Consequently, the court's power of discretion, vis-a-vis the Insurance Commissioner, is curtailed by the Commissioner's statutory powers and the statutes governing the management of insurance companies and rehabilitation proceedings. [Citing authority.]

This then is the role carried on by our courts under our laws relating to statutory rehabilitation. The court does not conduct the business of the seized company. This task is assigned by the legislature to the Insurance Commissioner who acts to protect the general public, the policyholders and owners of the company, and the company itself.

█ In the instant case, when the trial court imposed the type and character of operations manual here adopted, it divided, diminished, and dissipated the authority, control, and discretion legislatively vested in the Commissioner. It thrust the Commissioner into a contentious and litigious partnership with the company officers and virtually precipitated the trial court, as the arbiter, into the role of the rehabilitator. Such was not the intent of the legislature.

The primary duty impressed by the statute upon the Commissioner in a rehabilitation proceeding is to correct or remove the causes and conditions which have made the

rehabilitation proceeding necessary and, if possible, to conserve and restore the company to a viable status for the benefit of the policyholders. Toward this end he must be afforded that freedom of action in the over-all management of the company which will permit him to knowledgeably evaluate, plan, devise, and implement a program which in his best judgment and in keeping with his expertise in the field of insurance will accomplish the objective of the proceeding. And this must be done within and according to the managerial and operational guidelines and requirements set forth in the Insurance Code. As the program of rehabilitation takes form and the steps unfold, the trial court in its supervisory and reviewing role may not substitute its judgment for that of the Commissioner, but may and should only intervene or restrain when it is made to appear that the Commissioner is manifestly abusing the authority and discretion vested in him and/or is embarking upon a capricious, untenable or unlawful course.

The trial court in discarding the course of action advocated by the Commissioner and removing him as rehabilitator labeled his plan of rehabilitation capricious and found his reluctance to implement the company's plan intolerable. We cannot agree upon either score.

Throughout the proceedings the Commissioner steadfastly maintained that a serious cash flow problem was imminent, that income from the outstanding investments was essential on a cash rather than accrual basis, that the investment portfolio would have to be brought into line with the requirements of the Insurance Code, and that the company would have to be reoriented into its role as an insurer rather than that of a real-estate promoter, if the aims of the proceeding were to be accomplished. Implicit in this approach, as well as in the requirements of the Insurance Code, was the proposition that the company should not belatedly undertake the sale of insurance until such time as it could properly qualify under the Insurance

Code.[2] Likewise inherent in the approach advocated by the Commissioner was the proposition that the assets of the company could not, in the eyes and reach of the creditors or in the spirit of the Insurance Code, be internally and artificially segregated and separated from the over-all investment poblems for the purpose of qualifying the company to sell policies free of contingent liability.[3] The Commissioner's plan was supported by respectable expert testimony. We find nothing arbitrary, capricious, unreasonable or unlawful with the approach adopted by the Commissioner.

On the contrary, the plan advocated throughout by the company, and opposed by the Commissioner, further defers squarely facing the causes of the rehabilitation proceeding and the dilemma posed by the mortgage investments, and undertakes in the teeth of mounting internal and external financial crisis to engage in an insurance sales program regardless of the requirements of the Insurance Code. In short, the company asked and requested the court to direct that the Commissioner ignore the statutory requirements, his responsibilty to the public, and his duties under the

---

[2]RCW 48.09.010, for example, provides:

"(1) The commissioner shall not issue a certificate of authority to a domestic mutual insurer unless it has fully qualified therefor under this code, and unless it has met the minimum requirements for the kind of insurance it proposes to transact as provided in this chapter."

[3]RCW 48.09.270 provides:

"(1) A domestic mutual insurer on the cash premium plan, after it has established a surplus not less in amount than the minimum capital funds required of a domestic stock insurer to transact like kinds of insurance [in this case $100,000 in admissible assets as defined by RCW 48.12.010 and .020], and for so long as it maintains such surplus, may extinguish the contingent liability of its members to assessment and omit provisions imposing contingent liability in all policies currently issued."

And RCW 48.09.290 provides:

"(1) The commissioner shall revoke the authority of a domestic mutual insurer so to extinguish the contingent liability of its members if

"(a) at any time the insurer's assets are less than the sum of its liabilities and the surplus required for such authority, . . . ."

Insurance Code by implementing and carrying out such a plan.

We find nothing intolerable in the Commissioner's refusal. Even the trial court expressed some doubts as to the prospects offered by the plan.

Accordingly, and in summary, that portion of the fourth interlocutory order adopting the operations manual together with the ninth interlocutory order is vacated and reversed. The cause is remanded to the trial court with directions to (1) lend in deed and in spirit full force and effect to the order of November 10, 1964; (2) reinstate the Commissioner as rehabilitator with authority to assume full possession and managerial control of the company; (3) vest the Commissioner with authority during the pendency of these proceedings to relieve of any and all functions with the company such officers and directors as in his judgment may be necessary to best enable him to carry out his duties; and (4) direct the Commissioner to proceed with all deliberate speed to take such steps as are reasonable and necessary to implement his plan of rehabilitation and to remove the causes and conditions requiring rehabilitation or to otherwise proceed as the circumstances require.

The writ of certiorari issued in Cause No. 39754 relating to the fourth interlocutory order is dismissed.

It is so ordered.

FINLEY, C. J., WEAVER, ROSELLINI, HUNTER, HALE, NEILL, and McGOVERN, JJ., and DONWORTH, J. Pro Tem., concur.

October 1, 1968. Petition for rehearing denied.