# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| MIKE KREIDLER, Insurance Commissioner, | ) ) ) | DIVISION ONE |
| Respondent, | ) ) ) | No. 71063-0-I |
| v. | ) ) | |
| CASCADE NATIONAL INSURANCE COMPANY, | ) ) ) ) | PUBLISHED OPINION |
| Respondent, | ) ) | |
| and | ) ) | |
| JAMES S. FELTMAN, Chapter 11 Trustee for the Estate of Certified HR Services, Inc., | ) ) ) ) ) | |
| Appellant. | ) ) ) | FILED: March 10, 2014 |

DWYER, J. — Insurance Commissioner Mike Kreidler and Bankruptcy Trustee James Feltman have likely never met. Nevertheless, the lengthy litigation between these two men—as stand-ins for two corporations (one iniquitous, both insolvent)—continues. Today, we bring the legal strife between these men one step closer to finality by affirming the superior court's ruling that Kreidler (as Receiver of Cascade National Insurance Company) acted lawfully in denying the claim of Feltman (as Trustee of the Estate of the bankrupt Certified HR Services, Inc., as assignee of causes of action from the insolvent Midwest Merger Management, Inc.) that Cascade owes $4.3 million to Midwest and,

hence, to Certified. In affirming the superior court's decision, we hold both that the court did not abuse its discretion by confirming the Receiver's determination that the Trustee failed to prove his fraudulent transfer claim and that the court did not abuse its discretion in denying the Trustee's motion for discovery.

I

Cascade, which operated as a domestic stock insurance company in Washington, had a history of financial difficulties that prompted increased scrutiny from the Office of the Insurance Commissioner (OIC). On November 30, 2004, after notifying Cascade three times that it needed to cure a deficiency in its capital and surplus, the OIC obtained a superior court order appointing Kreidler, the Insurance Commissioner, as Receiver for the purpose of seizing Cascade. The court placed Cascade into receivership due both to Cascade's fragile financial condition and to questionable transactions between Cascade and Midwest. After spending nearly one year trying to rehabilitate Cascade, the Receiver petitioned the court for and obtained an order allowing it to liquidate Cascade.

Feltman is the Chapter 11 Trustee for the Estate of Certified HR Services, Inc. in a bankruptcy case pending in the United States Bankruptcy Court for the Southern District of Florida. In 2006, the Trustee, on behalf of Certified, entered into a settlement agreement with Midwest, which transferred and assigned to Certified all of Midwest's claims against Cascade. Subsequently, on December 4, 2007,[1] the Trustee filed a proof of claim with the Receiver. The proof of claim

---

[1] Twenty-one months after the Receiver's March 4, 2006 deadline for submitting claims.

2

was based on a fraudulent transfer theory and alleged, in pertinent part, the following:

> Each of the transfers [from Midwest to Cascade] are fraudulent transfers under RCW 19.40.041 and 19.40.051 because a) each transfer was made without the Transferor receiving reasonably equivalent value from Cascade, and b) at the time of each transfer, the Transferor was i) insolvent and/or became insolvent as a result of each transfer, ii) engaged or was about to be engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction, and/or iii) intending to incur, or should have reasonably believed that it would incur, debts beyond its abilities to pay as they became due.

The Trustee sought to recover $4.3 million from the Receiver.

In order to understand the Trustee's claim against the Receiver, it is necessary to be aware of the history between Cascade and Midwest, and of the federal litigation in which they were embroiled. Anthony Huff[2] and Danny Pixler created Midwest to acquire Certified Services, Inc., Certified HR Services, Inc., and their affiliates, and to operate these companies as professional employer organizations (PEO). A PEO contracts with employers to provide payroll services and workers' compensation insurance coverage to their employees. Midwest would first take possession and control of all of the insurance premiums and fees collected by the PEOs from the employees and employers, and would then procure and service the workers' compensation insurance coverage.

In 2003, Midwest lost coverage from its major carrier that had been providing workers' compensation coverage for the PEOs. This left Midwest in

---

[2] Although Huff had absolute control and authority over Midwest, he could not engage in the business of insurance because he had three federal court convictions for mail fraud relating to acts involving insurance and misappropriation of money paid by others for insurance premiums. Aware that his name could not be involved in any insurance business enterprise, Huff concealed his ownership and control of Midwest.

need of a carrier willing to provide coverage for over 15,000 PEO employees in California and that was licensed to provide workers' compensation insurance in California—a difficult license to obtain. Midwest learned that Cascade, which was having financial problems and needed an infusion of funds to keep its capital and surplus levels above the regulatory minimums, had such a license. Midwest subsequently agreed to provide Cascade with capital and surplus in exchange for a sale or transfer of a percentage ownership interest, which would allow Cascade to stay operational so that it could provide insurance coverage for Midwest's California PEO operations.

In order to complete this transaction, the OIC required submission of certain financial records. Knowing that his name could not be tied to the transaction, Huff created Gudeman & Weiss, LLC (G&W), an entity he used to acquire the interest in Cascade and to conceal his involvement in the transaction. G&W had no assets, capital contributions, or financial ability to make such a purchase and, as a result, Huff and Midwest provided all of the funds that were paid to Cascade. Although Midwest claimed to be a lender to G&W, G&W never executed any promissory notes to Midwest and was never asked to reimburse Midwest. Midwest's infusion of capital into Cascade allowed Midwest to satisfy its obligation to procure workers' compensation coverage from a licensed insurer for the California PEO, thus allowing Midwest to continue to receive premiums from the California PEO. However, Midwest did not pay Cascade for all of the insurance coverage, which resulted in a $19,310,744.00 debt to Cascade.

Once Cascade went into receivership, the Receiver filed suit in federal

4

court against Midwest and its operators, Anthony Huff, Sheri Huff,[3] and Pixler.

The Receiver's claims included, among others, misappropriation, civil conspiracy, violations of the Criminal Profiteering and Consumer Protection Acts, and breach of contract. Following a jury verdict in the Receiver's favor, the federal district court entered judgment against Midwest and its co-defendants, jointly and severally, for the unpaid premiums and fees of $19,310,744.00, plus attorney fees and costs, for a total judgment in excess of $21 million.

Subsequently, in this action, the Receiver denied the Trustee's claim on March 27, 2012 (hereinafter Initial Determination). The Receiver determined that the Trustee did not provide evidence or proof to establish the necessary elements of his claim that Midwest's transfers to Cascade were fraudulent and, accordingly, the Trustee failed to meet his burden under either RCW 19.40.041 or RCW 19.40.051. Additionally, the Receiver concluded that the Trustee's fraudulent transfer claim failed because Midwest received "reasonably equivalent value" from Cascade, as evidenced by the payment of capital and surplus to Cascade, which allowed Midwest to continue providing workers' compensation insurance for its PEO operations.[4]

Before filing an objection to the Initial Determination, the Trustee filed a discovery motion in superior court on May 11, 2012, seeking to obtain "documents, materials and other records concerning the Receiver's Initial Claim Denial." Although the Receiver disputed the Trustee's claim that he was entitled

---

[3] Anthony Huff's wife.

[4] In the Initial Determination, the Receiver also classified the Trustee's claim as a late-filed claim, noting that "even if accepted and approved by the Receiver on the merits" it would be a Class 7 claim pursuant to RCW 48.31.280(7). However, the Receiver did not state that he was denying the Trustee's claim because it was filed late or because it was unlikely to be recoverable.

to discovery, the Receiver voluntarily provided the Trustee with documents and exhibits from the federal court litigation. The Trustee then withdrew the discovery motion.

On May 29, the Trustee timely submitted a written objection to the Receiver's Initial Determination. Therein, the Trustee asserted that although Midwest had paid approximately $4.3 million for purchase of Cascade preferred stock, the stock was actually issued to G&W. Therefore, the Trustee contended, the Receiver erred in concluding that Midwest received "reasonably equivalent value" from Cascade.

On August 2, after considering the Trustee's objection, the Receiver denied the Trustee's claim (hereinafter Final Determination). In the Final Determination, the Receiver reiterated that the Trustee had failed to satisfy his burden to prove each element of his fraudulent transfer claim. Additionally, in addressing the objection raised by the Trustee regarding the issuance of stock certificates to G&W, the Receiver concluded, first, that by virtue of providing the infusion of capital and surplus to Cascade, Midwest was able to meet its obligation to obtain licensed workers' compensation insurance for its PEOs and to continue to collect payments from the PEOs, and, second, that evidence presented in the federal court litigation established that G&W was a front for Midwest, meaning that Midwest received the benefit of the stock certificates.

On August 6, the Receiver filed a petition in superior court seeking an order confirming its Final Determination and noted the petition for hearing. The Trustee opposed the petition and also sought a continuance and additional

discovery. Thereafter, the superior court confirmed the Final Determination and denied the Trustee's request for a continuance and additional discovery. In doing so, the court made the following pertinent findings with respect to the Trustee's fraudulent transfer claims: the Trustee failed to meet his burden of proof on his fraudulent transfer claim; sufficient evidence supported the Receiver's determination that Midwest received reasonably equivalent value from Cascade; and the Receiver's Final Determination was supported by substantial evidence.

The court also made the following pertinent findings with respect to the Trustee's motion for discovery: the Trustee could have obtained information relating to the federal litigation from public sources, from Midwest, or from Midwest's counsel in the federal litigation; the Receiver had no responsibility to produce such information in the statutory proof of claim proceedings; the Trustee's attempt to seek broad discovery as to the Receiver's actions in administration of the estate was impermissible under the statutory proof of claim process, which is controlled by RCW 48.31.145; and, even if such discovery requests were properly before the court, nothing in the record supported access to such broad discovery.

The Trustee appeals from the trial court's order confirming the Final Determination and denying his request for additional discovery.

II

The Trustee contends that the Receiver abused his discretion in concluding that Midwest had received reasonably equivalent value, and that the

trial court erred when it confirmed this determination. This is so, he avers, for two reasons: (1) the federal litigation did not establish that G&W was operating as a front for Midwest, and (2) despite Midwest's $4.3 million contribution to Cascade, Cascade still went into receivership just one year later. We disagree.

In an insurance receivership action, the trial court reviews the Receiver's determinations under an abuse of discretion standard.

> As the program of rehabilitation takes form and the steps unfold, the trial court in its supervisory and reviewing role may not substitute its judgment for that of the Commissioner, but may and should only intervene or restrain when it is made to appear that the Commissioner is manifestly abusing the authority and discretion vested in him and/or is embarking upon a capricious, untenable or unlawful course.

Kueckelhan v. Fed. Old Line Ins. Co. (Mut.), 74 Wn.2d 304, 316, 444 P.2d 667 (1968). In explaining the rationale for this deferential standard, the Kueckelhan court made clear that the commissioner's role is more aptly characterized as a neutral arbiter than as a zealous advocate.

> [T]he legislature, in its wisdom, in its reliance upon the presumed expertise and experience of a duly elected and functioning state official, and in the public interest, vested the Commissioner with a realistic and effective control over the administration of the affairs and assets of an insurer found to be in need of rehabilitation. The authority so vested necessarily contemplates and embraces a considerable degree of independent administrative judgment and discretion to be exercised by the Commissioner if he is to carry out the responsibility and trust imposed upon him.

Kueckelhan, 74 Wn.2d at 314.

Although it is well settled that the trial court's standard of review is abuse of discretion, no reported decision has clarified what standard this court should employ in reviewing the trial court's order. California appellate courts, however,

8

review trial court decisions in insurance receivership actions utilizing an abuse of discretion standard. Low v. Golden Eagle Ins. Co., 104 Cal. App. 4th 306, 316, 128 Cal. Rptr. 2d 423 (Cal. App. 1 Dist. 2002); In re Exec. Life Ins. Co., 32 Cal. App. 4th 344, 358, 38 Cal. Rptr. 2d 453 (Cal. App. 2 Dist. 1995). In California and Washington, the policy rationales for affording the insurance commissioner significant discretion in insurance receivership proceedings are quite similar. Compare Low, 104 Cal. App. 4th at 315-16 ("Our high court has long since observed that such conservation proceedings arise under the broad police powers of the state to ensure the reorganization or orderly liquidation of insolvent insurers and the protection of their policyholders and the public."), with Kueckelhan, 74 Wn.2d at 315 ("'This task [of conducting the business of the seized company] is assigned by the legislature to the Insurance Commissioner who acts to protect the general public, the policyholders and owners of the company, and the company itself.'" (quoting Kueckelhan v. Fed. Old Line Ins. Co. (Mut.), 69 Wn.2d 392, 406, 418 P.2d 443 (1966))). Accordingly, in furtherance of the policy explicated in Kueckelhan, we review the trial court's confirmation of the Receiver's Final Determination for an abuse of discretion. As part of this circumscribed review, we accept "the trial court's resolution of credibility and conflicting substantial evidence, and its choice of possible reasonable inferences." Exec. Life Ins., 32 Cal. App. 4th at 358. A decision constitutes an abuse of discretion when it is "is manifestly unreasonable or based on untenable grounds." In re Marriage of Fiorito, 112 Wn. App. 657, 663-64, 50 P.3d 298 (2002).

A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard.

Fiorito, 112 Wn. App. at 664.

The Trustee makes fraudulent transfer claims pursuant to RCW 19.40.041 and RCW 19.40.051, both of which are provisions of Washington's Uniform Fraudulent Transfer Act (UFTA). RCW 19.40.041 provides in part:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

RCW 19.40.051 provides in part:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

As part of proving a constructive fraud claim pursuant to RCW 19.40.041(a)(2)(i)(ii) and 19.40.051(a), the Trustee must demonstrate that Midwest did not receive reasonably equivalent value from Cascade. The UFTA

does not provide a general definition for the phrase "reasonably equivalent value" and Washington courts have not provided guidance in this context. Nevertheless, because the provisions in which this phrase appear mirror the fraudulent transfer provision of the Bankruptcy Code, decisions under the Code are instructive. Compare RCW 19.40.041(a)(2)(i)(ii), and RCW 19.40.051(a), with 11 U.S.C. § 548(a)(1)(B)(i)(ii)(I)(II)(III). See also In re Reisner, 357 B.R. 206, 216 (Bankr. E.D. N.Y. 2006) (concluding that "[t]he analysis under Florida law of whether reasonably equivalent value was given is identical to that under Section 548 of the Bankruptcy Code" after identifying that Florida law was "essentially identical" to the fraudulent transfer provisions of the Code). Decisions interpreting the Code indicate that "[i]t is well settled that a debtor need not benefit directly in order to receive reasonably equivalent value for a transfer. He may benefit indirectly through benefit to a third person." Johnson v. First Nat'l Bank, 81 B.R. 87, 88 (Bankr. N.D. Fla. 1987) (citing Williams v. Twin City Co., 251 F.2d 678, 681 (9th Cir. 1958); Klein v. Tabatchnick, 610 F.2d 1043, 1047 (2d Cir. 1979); Rubin v. Mfrs. Hanover Trust Co., 661 F.2d 979, 991 (2d Cir. 1981)). Furthermore, "'[i]f the consideration given to a third person ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved . . . .'" Johnson, 81 B.R. at 88 (second alteration in original) (quoting Rubin, 661 F.2d at 991).

Although Cascade did not issue stock certificates directly to Midwest, evidence in the federal court litigation indicates that G&W—the entity that

11

received the stock directly—was operating as a front for Midwest. The Receiver explicitly relied on this evidence in concluding that Midwest did receive reasonably equivalent value because it controlled G&W and, thus, that the benefit of the stock was ultimately conferred upon Midwest. Nevertheless, the Trustee contends that the Receiver erred by asserting that the federal court litigation "established" that G&W was a front for Midwest. Specifically, the Trustee asserts, "[n]either the jury verdict nor the Ninth Circuit decision found that G&W was a 'front' for Midwest." However, the Trustee cites no authority for the proposition that, in order for the Receiver to conclude that G&W was a front for Midwest, his conclusion must have been anchored to a jury verdict or a federal court order. The Receiver acted within his discretion when he concluded that the evidence from the federal litigation was dispositive.

Similarly, the Receiver did not abuse his discretion by concluding that Midwest received reasonably equivalent value by virtue of Cascade staying in business, which in turn allowed Midwest to satisfy its obligation to procure workers' compensation coverage from a licensed insurer for the California PEO, thus allowing Midwest to continue to receive premiums from the California PEO. The Trustee asserts that Midwest did not receive reasonably equivalent value because, despite its infusion of capital into Cascade, Cascade went into receivership just one year later. However, the Trustee does not provide authority to support his position, and his legally unsupported assertion that Midwest did not receive reasonably equivalent value does not provide a tenable ground on which either this court or the superior court could conclude that the Receiver abused his

12

discretion.[5]

The Trustee next contends that the Receiver abused his discretion when he determined that the Trustee failed to meet his burden of proof on his fraudulent transfer claim, and that the trial court erred when it confirmed this determination. This is so, the Trustee asserts, because the Receiver's own documents show that Midwest paid approximately $4.3 million to Cascade and received nothing in return. We disagree.

In order to establish his fraudulent transfer claim under chapter 19.40 RCW, the Trustee needed to prove that Midwest did not receive reasonably equivalent value from Cascade, and also establish either that (1) Cascade had an actual intent to defraud, or (2) its actions constituted constructive fraud. See Sedwick v. Gwinn, 73 Wn. App. 879, 885, 873 P.2d 528 (1994). With respect to "actual intent," the Trustee needed to prove by clear and satisfactory evidence that the debtor, Midwest, made each transfer to the creditor, Cascade, with the "actual intent to hinder, delay, or defraud any creditor." RCW 19.40.041(a)(1); Douglas v. Hill, 148 Wn. App. 760, 766, 199 P.3d 493 (2009). The Trustee failed to provide any evidence of actual intent. Accordingly, RCW 19.40.041(a)(1) did not support his fraudulent transfer claim.

With respect to "constructive fraud," the Trustee needed to prove that Cascade's actions constituted constructive fraud. RCW 19.40.041(a)(2)(i)(ii);

_____

[5] "[T]he question of reasonably equivalent value is determined by the 'value of the consideration exchanged between the parties *at the time of the conveyance or incurrence of debt which is challenged.*'" In re NextWave Pers. Commc'ns, Inc., 200 F.3d 43, 56 (2d Cir. 1999) (quoting In re NextWave Pers. Commc'ns, Inc., 235 B.R. 277, 290 (Bankr. S.D. N.Y. 1999)). Therefore, Cascade's state of insolvency one year later is not helpful in determining whether Midwest received reasonably equivalent value at the time that it paid Cascade $4.3 million.

RCW 19.40.051(a); Douglas, 148 Wn. App. at 768-69. The Trustee had two possible methods of proving constructive fraud, both of which required the Trustee to present substantial evidence in support of his claim. Sedwick, 73 Wn. App. at 885. The first method required the Trustee to show either (i) that Midwest was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small, or (ii) that Midwest intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. RCW 19.40.041(a)(2)(i)(ii). The second method required the Trustee to show that Midwest was insolvent at the time of the transfer or became insolvent as a result of the transfer. RCW 19.40.051(a).

The Trustee did not establish constructive fraud by either method of proof. As to the first, the Trustee offered no evidence either (i) that Midwest was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small, or (ii) that Midwest intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. Accordingly, the Trustee failed to meet his burden of proof.[6]

---

[6] Although the Trustee attempts to make use of the second method, his efforts are also unsuccessful. He contends that, because the Receiver argued to the trial court that Midwest was set up as Ponzi scheme—which, by definition, is an enterprise insolvent from its inception—there was substantial evidence in the record of constructive fraud. The Trustee's contention is unavailing. The Trustee cites to statements made by the Receiver's counsel before the trial court, a proceeding subsequent to the Receiver's Final Determination, meaning that the Receiver could not have seen, let alone relied on, the hearing transcript. Moreover, even if there was evidence before the Receiver to support such an assertion, the Trustee has failed to identify it, managing only to assert that it is telling that the Receiver never contended that Midwest was solvent or fully capitalized because he knew that was not the case. Such conjecture does not provide a basis for this court to conclude that the Receiver abused his discretion. To the

III

The Trustee also contends that the trial court erred when it denied his discovery motion. This is so, he asserts, because (1) he has a legal interest in the estate, and (2) he demonstrated "a reasonable suspicion of negligence or malfeasance." We disagree.

"A trial court has wide discretion in ordering pretrial discovery; such orders are reviewed for manifest abuse of discretion." Gillett v. Conner, 132 Wn. App. 818, 822, 133 P.3d 960 (2006). "A trial court abuses its discretion when its order is manifestly unreasonable or based on untenable grounds" and it "necessarily abuses its discretion if it applies the incorrect legal standard." Gillett, 132 Wn. App. at 822.

Insofar as the Trustee sought to discover evidence in the Receiver's possession from the federal litigation relating to the Trustee's claim, the trial court did not abuse its discretion by denying the Trustee's discovery motion. The Receiver's role is more aptly characterized as a neutral arbiter than as a zealous advocate. See Kueckelhan, 74 Wn.2d at 314-15. Fittingly, the statutory scheme for administering proofs of claim requires claimants to produce evidence to support their own claim; it does not, however, provide a process for obtaining discovery from the Receiver. See RCW 48.31.310(1) ("the commissioner shall

_____

contrary, it is apparent that the Receiver acted well within his discretion in concluding that the Trustee failed to present substantial evidence that Midwest was insolvent at the time of the transfer with Cascade.

However, we do not base our ruling on the Trustee's unsuccessful insolvency argument. The Trustee failed to make this argument to the Receiver or to the trial court, and made it for the first time on appeal in his reply brief. Because this is not the proper manner in which to present an argument on appeal, we decline to make it the basis for our ruling. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

notify all persons who may have claims against such insurer and who have not filed proper proofs thereof, to present the same to him or her"). Moreover, the trial court recognized that the discovery sought was available to the Trustee from other sources—including public sources, Midwest, or Midwest's counsel in the federal litigation—and that the Trustee had considerable time and opportunity to obtain this information through such sources.

Nevertheless, the Trustee invokes RCW 48.99.017(3), a provision of the Uniform Insurers Liquidation Act, and asserts that this provision required the superior court to conduct an in-camera review of the documents that the Trustee requested before determining whether to permit discovery. The Trustee invoked this provision in an effort to establish that the Receiver was mismanaging the receivership. The pertinent statutory language is quoted below.

> Any person who can demonstrate a *legal interest* in the receivership estate or a *reasonable suspicion of negligence or malfeasance* by the commissioner related to an insurer receivership may file a motion in the receivership matter to allow inspection of private company information or documents not subject to public disclosure under subsection (1) of this section. The court shall conduct an in-camera review after notifying the commissioner and every party that produced the information. The court may order the commissioner to allow the petitioner to have access to the information, provided the petitioner maintains the confidentiality of the information.

RCW 48.99.017(3) (emphasis added). For several reasons, this provision does not provide a basis for the Trustee to obtain discovery.

Initially, the Trustee cannot demonstrate a legal interest in the receivership estate because he failed to prove any valid claim against Cascade. Accordingly, that statutory language does not provide a basis for requiring the trial court to

16

conduct an in-camera review. In addition, the Trustee did not demonstrate a "reasonable suspicion of negligence or malfeasance" by the Receiver. The Trustee raises a number of arguments which, he contends, demonstrate the requisite reasonable suspicion. Whether considered individually or collectively, they are unavailing.

As to these arguments, the Trustee first asserts that there was a lack of evidence supporting the Receiver's assertion that Midwest actually received reasonably equivalent value for payments to Cascade. However, as previously explained, the trial court did not abuse its discretion in confirming the Receiver's determination that Midwest did receive reasonably equivalent value from Cascade. Second, the trustee avers that the Receiver falsely asserted that the federal court litigation established G&W was merely a front for Midwest. However, as previously explained, it was not incumbent upon the Receiver to anchor his determination to a jury verdict or a court order to conclude that G&W was a front for Midwest. Third, the Trustee contends that the Receiver repeatedly changed his basis for denying the Trustee's claim. However, the Receiver determined, and the trial court confirmed, that the Receiver's classification of the Trustee's claim as a late-filed claim that was unlikely to be recoverable (the gravamen of this claim) was done to allow the Trustee to fully evaluate whether to continue to expend legal resources to pursue a likely unrecoverable claim—not as a basis for denying the Trustee's claim. Fourth, the Trustee argues that the Receiver wasted estate assets attempting to justify denying the Trustee's claim "at all costs." However, the Trustee has failed to

provide persuasive evidence that the Receiver was trying to "win at all costs."

Fifth and finally, the Trustee claims that the Receiver wasted $2.5 million in

estate resources pursuing an uncollectible judgment against Midwest in the

federal court litigation. However, the Trustee second-guessing the pursuit of

these claims due to current issues of collectability—eight years after the case

was filed—does not provide a sufficient basis for us to conclude that the Receiver

acted improperly such that an in-camera review of evidence in the Receiver's

possession was warranted. Ultimately, the trial court did not abuse its discretion

when it denied the Trustee's motion for discovery.

Affirmed.

We concur:

Cox, J.